IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AMY THOMSON, ET AL.,<br><br>Plaintiffs,<br><br><br><br>vs.<br><br><br><br>SALT LAKE COUNTY and ALAN MORRICAL,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:05-CV-352 TS |

This matter comes before the Court on Defendants' Motion to Strike[1] and Motion for Summary Judgment as to all of Plaintiffs' claims.[2] Plaintiffs' claims relate to the April 19, 2004 shooting of Chad Thomson by police officers during an arrest attempt.

---

[1]Docket No. 34.

[2]Docket No. 25.

1

I.  BACKGROUND

The undisputed facts establish the following:  On April 19, 2004, at around 2:00 a.m., Chad Thomson ("Thomson"), was out for an evening of drinking, when he called his wife, Amy Thomson ("Amy") who was at a female friend's apartment.  Thomson became angry, threatened to act violently, and told Amy to meet him at their residence.  Amy's mother, who was at the Thomson residence, called 911 after Amy related via phone her conversation with Thomson.  Amy then went to the Thomson residence with her friend, where she met two male friends of Thomson's.  Two officers arrived in a patrol car.  Thomson pulled up to the house but left upon seeing the officers.  The officers left to find Thomson.  Amy went downstairs to check on an area of the home where firearms were located.  Upon doing so, she unexpectedly encountered Thomson, who pointed a weapon in her direction.  Amy fled upstairs to where the others were located and her friend made a second 911 call.  Amy's friend indicated to dispatch that Thomson had been talking about suicide.  Thomson left the home.

Deputies Shire, Jarvis, and Morrical soon arrived in response to this second 911 call.  The officers learned that Thomson had threatened Amy with a gun, taken a gun from the home, was potentially suicidal, and had left his truck parked on a nearby street.  Another deputy at the scene reported seeing a man jump a backyard fence south of the Thomson residence.  Officers, believing that Thomson was a danger to his family and others, and that his actions constituted aggravated assault, requiring them to arrest him pursuant to Utah Code Ann. § 77-36-22.2(2), determined that he should be apprehended.  Officers set up a containment of the block.  Officer Morrical used his police dog to search the Thomson residence.  Morrical and the other officers then yelled out a warning and proceeded to search the Thomson yard with the dog.  After failing to find Thomson, Officers Morrical, Shire, and Jarvis began a yard-by-yard search.  Officers

searched two yards with the dog on a leash, and paused at a third.  Officers noted that there were many locations where Thomson could be hiding in the privacy fenced yards.  The weather was stormy, it was raining, and sounds were muffled.  Morrical then released his dog into the third yard in an attempt to locate Thomson.  Morrical did not call out a warning before he did so.

At some point, Thomson's father received a call from Thomson, who was carrying a cell phone, while Thomson hid from the officers.  Thomson stated that he was in trouble, that police wouldn't listen to him, had set dogs after him, and that Thomson's father would read about Thomson in the obituaries.  At around the same time, Thomson was also on the phone with Lt. Wardle, an officer then located inside of the Thomson residence.  Lt. Wardle spoke with Thomson briefly about surrendering.  Wardle noticed that he could hear a dog barking on Thomson's end, then conveyed to the searching officers via radio that they must be close to Thomson, and that Thomson wanted them to back off.  Wardle told the searching officers to be careful.  Based on Wardle's communication, the searching officers felt they were getting close to Thomson.

After the dog had been gone for a period of time, Morrical called for the dog to return.  The dog did not return.  Officers began hearing noises coming from the third yard.  They fanned out, and began advancing towards the noises.  As they did so, they triggered a motion sensor light.  Officers yelled to the owner of the home to turn the light off, which she did.  Officers then heard Thomson yelling for them to call the dog off.  Thomson threatened to shoot, although the officers were unclear as to whether he was referring to shooting at the dog or at them.  As Officers Morrical and Shire drew near, they could see Thomson, who was standing and holding a gun, behind an object in the yard.  The dog was biting Thomson.  Officer Jarvis could not see Thomson from where he was positioned.

The officers, guns drawn, ordered Thomson to put the gun down, get on the ground, and come out with hands up, and that if he did so, the dog would be called off. After Thomson failed to comply, officers gave another warning. Morrical then saw Thomson place the barrel of the gun into his mouth briefly, then quickly take it out and move it towards Morrical. Shire did not see Thomson place the barrel into his mouth, but saw the gun being raised in his direction. Shire prepared to fire, depressing his trigger slightly. Before Shire completed this action, Morrical fired one shot into Thomson's head, which subsequently resulted in his death. From the final positioning and movement of Thomson's gun, Shire originally thought Thomson had shot himself. Although Jarvis could not see Thomson, he also believed, from seeing part of Thomson's subsequent fall, that he had shot himself. Accordingly, Shire and Jarvis reported that Thomson had shot himself. Morrical did not immediately correct this information, but returned his dog to his patrol car. Soon after, Morrical corrected the other officers and stated that it was he who had shot Thomson.

Thomson's family and estate have brought the following causes of action against Salt Lake County and Officer Morrical: (1) excessive force under § 1983[3] in violation of the Fourth Amendment, (2) negligence (for the County's alleged failure to train and supervise officers), (3) intentional and/or negligent infliction of emotional distress, (4) battery, (5) assault, and (6) wrongful death.

---

[3] 42 U.S.C. § 1983.

## II. DEFENDANTS' MOTION TO STRIKE

Defendants seek to strike an expert report ("the Bogardus Report"), a portion of which is attached by Plaintiffs to their Memorandum in Opposition of Defendant's Motion,[4] under Fed. R. Evid. 702. The Bogardus Report includes expert opinion regarding officer tactics, the use of force, and proper deployment of police dogs. Defendants state that the opinion does nothing to assist in understanding any fact issue in this case, and is unreliable. However, the Court finds that the Bogardus Report addresses the disputed issues in this case, is based on sufficient facts and data, and is the product of reliable principles and methods which have been applied to the facts of this case. Therefore the Court declines to strike the affidavit.

Defendants also seek to strike transcripts of Plaintiffs' alleged 911 emergency call on April 19, 2004, also attached to Plaintiffs' Opposition.[5] Specifically, Defendants assert that the transcripts are not self authenticating and would be inadmissible hearsay at trial. However, at the summary judgment stage, "evidence need not be submitted in a form that would be admissible at trial" since that evidence "may ultimately be presented at trial in an admissible form."[6] Because Plaintiffs could properly authenticate the transcripts at trial, the Court declines to strike them.

---

[4]Docket No. 28, Ex. 13 or "L."

[5]Docket No. 28, Ex. 17 or "P."

[6]*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quotations and citations omitted).

III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.  The Summary Judgment Standard

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[7]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[8]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[9]

B.  Qualified Immunity and Excessive Force Claim

Defendants assert that they are entitled to summary judgment because they are entitled to qualified immunity.  "When a § 1983 defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff. . . ."[10]  "To prevail . . . a 'plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred.'"[11]  "If the plaintiff fails to meet his or her burden on [the] threshold inquiry [regarding the constitutional right], the

---

[7] Fed. R. Civ. P. 56(c).

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);  *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

[10] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

[11] *MIMICS, Inc. v. Village of Angel Fire*, 394 F.3d 836, 841 (10th Cir. 2005).

qualified immunity inquiry comes to an end."[12]  Accordingly, the issue of whether Plaintiffs' constitutional rights were violated through the use of excessive force follows.

Unreasonable seizure or excessive force claims are assessed under the "objective reasonableness" standard of the Fourth Amendment.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[13]  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[14]  Moreover,

> [i]n evaluating an excessive force claim, courts are to consider the totality of the circumstances.  Among the factors to consider are the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. . . . The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force. . . . [D]eadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.  In other words, an officer's use of deadly force in self-defense is not constitutionally unreasonable."[15]

Plaintiffs claim that there are disputed issues of material fact which preclude this Court from rendering summary judgement, including: (1) whether Morrical was truly in danger at the time he deployed deadly force (specifically with respect to the positioning of Thomson's gun at

---

[12]*Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

[13]*Graham v. Connor*, 490 U.S. 386, 396 (1989).

[14]*Id*.

[15]*Jiron*, 392 F.3d at 414-15.

the time of the shooting), and (2) whether officers unreasonably created the need to use deadly force through their own reckless and deliberate conduct.[16]

   1. Self Defense

First, Plaintiffs assert that Morrical was not in danger when he released the dog, which was officers' initial use of deadly force. As a matter of law, the use of a police dog is not properly considered deadly force, and therefore, Plaintiffs' arguments on this point are inapposite.[17] Plaintiffs also argue that there is a genuine issue of material fact as to whether Morrical was truly in danger at the precise moment he shot Thomson. Plaintiffs point to the depositions of Officers Jarvis, Shire, and Morrical, and assert that there are discrepancies between the officers' testimonies, which create issues of material fact, as to where Thomson's gun was pointed at the moment he was shot by Morrical. Plaintiffs emphasize that Officers Shire and Jarvis initially mistakenly thought and reported that Thomson had shot himself. However, a careful review of the deposition testimony of the officers fails to show issues of material fact as to whether Thomson's gun was in play when he was shot.

The Court finds that the officers' depositions establish the following: Officer Jarvis could not see Thomson or his weapon either before, or at, the precise time Thomson was shot. Therefore, his testimony does not conflict with that of the other officers. Officer Shire, while noting that Thomson's gun was pointing upward towards Thomson's head at, or soon after, the time he was shot, also noted that Thomson's gun was in the process of being drawn upwards, and

---

[16]Docket No. 28, at 31.

[17]*Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 n.1 (10th Cir. 2005) (noting that "every circuit to consider the question [of whether use of a dog is deadly force] has held that it is not").

that Shire, believing that the gun was pointed in his direction during the course of this movement, was preparing to fire his weapon at Thomson just before Morrical fired. Indeed, Shire went so far as to begin depressing the trigger of his weapon, but did not complete the firing action before Morrical fired. There were no other eyewitnesses to the shooting.

Looking to this evidence and construing the facts and inferences in a light most favorable to Plaintiffs, no reasonable jury could return a verdict in favor of Plaintiffs on the issue of whether Morrical was acting in self-defense. Even if the evidence established that the exact direction in which the gun was pointing was a disputed issue of fact, the disputed fact would not necessarily be material as this is only one factor among several the Court uses to assess the totality of the circumstances.

Additional undisputed facts strongly support the conclusion that, as a matter of law, a reasonable officer in Morrical's position would have had probable cause to believe that there was a threat of serious physical harm to himself or to others. First, Thomson had earlier threatened his wife with violence, both over the phone, and later in their residence. Importantly, the second threat was accompanied with the use of a gun. Second, Wardle, after having spoken to Thomson on the phone, and telling him to surrender, communicated to the searching officers, including Morrical, that they were to be careful. Third, when Morrical and the other officers confronted Thomson, he was waving a gun, which he was refusing to surrender despite repeated warnings. Fourth, Morrical, as well as the other officers, heard Thomson threaten to shoot. Finally, the fact that the two officers able to see Thomson felt the need use deadly force during the confrontation supports that Morrical's actions using deadly force were reasonable and were in self defense.

Because the undisputed facts establish that Morrical was acting in self defense, Defendants are precluded, as a matter of law, from establishing excessive force.

2. The Issue of Reckless Conduct

Plaintiffs make several arguments that there is a genuine issue of material fact as to whether the officers unreasonably created the need to use deadly force through their own reckless and deliberate conduct.

First, Plaintiffs cite to the Bogardus Report which notes that the deployment of a police dog on an armed suspect usually prompts a suspect to use the weapon to stop the dog's attack, and that, therefore, officers should withdraw dogs from actions involving an armed suspect. However, Morrical's deployment of the dog, given the circumstances here, was not reckless, and was certainly not unreasonable.

Officers had not located the armed and fleeing or hiding Thomson with certainty, and, considering that it was dark and raining, and that officers were dealing with an armed suspect, Morrical made the objectively reasonable decision that deployment of the dog might mitigate the dangers presented to officers under the circumstances. Plaintiffs argue that Thomson asked officers to call the dog off, and that the officers' failure to do so aggravated Thomson, thereby contributing to the need to use deadly force. However, this does not support that officers' actions were either reckless or unreasonable. Officers need not acquiesce to an armed and threatening suspect's demands when they are attempting to apprehend him.

Second, Plaintiffs argue that the officers, specifically Lt. Wardle, rejected opportunities to negotiate with Thomson, thereby contributing to the need to use force. This argument is inapposite as it involves the actions of Lt. Wardle, who is not a defendant in this case. Moreover, the evidence demonstrates that negotiation was attempted, both by the searching officers, when they offered to call off the dog in return for Thomson's surrender of the weapon, and by Wardle, when Thomson was given opportunity to surrender. Thomson refused to do so.

10

Third, Plaintiffs, again pointing to the Bogardus Report, state that, because Thomson was suicidal and armed, officers' actions in rushing to apprehend him were improper and led to the use of deadly force.  In support of this argument, Plaintiffs cite *Allen v. Muskogee*[18] where the Tenth Circuit reversed the district court's grant of summary judgment for the defendant on an excessive force claim because an expert report posited that officers' actions in rushing an armed and suicidal suspect were reckless.[19]  Plaintiffs further argue that Thomson was located and cornered, and that officers, instead of moving in, should have established a perimeter and attempted negotiation.  Importantly, the evidence in the present case supports that Thomson was not only suicidal, but homicidal.  Also, even if officers could have taken alternative actions, Plaintiffs' argument does not support that the officers' were reckless.

The Tenth Circuit case of *Medina v. Cram*,[20] which reversed the district court's denial of summary judgment for defendants in an excessive force case, distinguished the case of *Allen v. Muskogee*.  In distinguishing *Allen*, the *Medina* court noted that, unlike the *Medina* defendants, the *Allen* defendants did not raise a qualified immunity defense, which, had it been raised in *Allen*, would have required a greater showing of officer recklessness by the plaintiff.[21]  Also, the *Medina* court noted that "[i]f we were to . . . consider the expert's assertions regarding [officers'] failure to use [alternative tactical measures], we would be evaluating the officers' conduct from the 20/20 perspective of hindsight rather than from the perspective of an officer making split-

---

[18]119 F.3d 837 (10th Cir. 1997).

[19]*Id.* at 842.

[20]252 F.3d 1124 (10th Cir. 2001).

[21]*Id.* at 1132.

second judgments on the scene."[22]  Finally, the *Medina* court distinguished its plaintiff's expert testimony from that in the *Allen* court, stating that the *Medina* expert's conclusions "did not indicate whether [it] rest[ed] on a finding that the officers acted recklessly, as opposed to negligently."[23]

      Here, like in *Medina*, Defendants have raised the qualified immunity defense, requiring Plaintiffs to make a greater showing as to recklessness, which they have not done.  Moreover, if the Court were to consider Plaintiffs' expert's recommendations, or the proffered alternative actions officers *could have* taken on April 19, 2004, the Court would be improperly viewing the officers' conduct from hindsight.  Furthermore, Plaintiffs' expert, like the one in *Medina*, fails to indicate whether his conclusions rest on a finding that the officers here acted recklessly, as opposed to merely negligently.

      Finally, Plaintiffs argue that Morrical's actions were inconsistent with self defense because he did not, as he had an opportunity, and as Utah officers are trained to do, fire two shots into Thomson's chest; rather, he fired one shot into Thomson's head.  Plaintiffs also point to Morrical's delay in informing the other officers that he had shot Thomson.  Plaintiffs assert that given this evidence, a reasonable jury could determine that officers recklessly and unreasonably created the need to use deadly force.  Plaintiffs' arguments readdress the self defense issue, which is irrelevant here.  These additional arguments do not demonstrate either that there are genuine issues of material fact as to whether Morrical was acting in self defense, or that officers

---

[22]*Id.* at 1133.

[23]*Id.*

unreasonably created the need to use deadly force through their own reckless and deliberate conduct.

Viewing the facts in a light most favorable to Plaintiffs, no reasonable jury could find that the officers' actions were reckless in this instance. The officers were statutorily required to apprehend and arrest Thomson, who was in turn, evading arrest. Moreover, the evidence in the record shows that the immediate need to use deadly force arose from the conduct of Thomson, and not that of the officers. It was Thomson who repeatedly threatened violence and refused to surrender or drop his weapon when ordered to by officers. It was Thomson who pointed his gun towards officers.

The totality of the circumstances indicates that Plaintiffs have not met their burden in demonstrating excessive force by Officer Morrical in violation of the Fourth Amendment. The undisputed facts in this case are indicative of the allowance that the Court should give to officers forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. Thomson's actions, especially threatening others with a gun, resulted in the commission of serious crimes. Officer Morrical acted in self defense against Thomson, who posed an immediate threat to the safety of the officers and others, and who was actively resisting arrest and attempting to evade arrest by flight. Because, as a matter of law, Plaintiffs cannot show that Defendants violated Fourth Amendment rights, Defendants have qualified immunity as to the excessive force cause of action.

As a side note, it is unclear whether Plaintiffs have alleged a failure to train claim under § 1983. Their Complaint indicates that they have not, but the issue has been addressed in the

subsequent briefing by the parties.  To the extent that Plaintiffs so allege inadequate training on the part of Salt Lake County, Plaintiffs must establish that Officer Morrical exceeded constitutional limitations on the use of force,[24] which they have failed to do.  Therefore, Defendants are entitled to summary judgment on any such claim.

### C.  State Law Claims

#### 1.  Negligence

Defendant argues that Plaintiff's negligence claim is barred by the Governmental Immunity Act of Utah ("the Immunity Act").  The Immunity Act states that "[i]mmunity is not waived . . . if the injury arises out of, in connection with, or results from: . . . (b) assault, battery, . . . infliction of mental anguish, or violation of civil rights."[25]  Moreover, Utah law "reject[s] claims that have reflected attempts to evade [the Immunity Act's] statutory categories by recharacterizing the supposed cause of the injury [as sounding in negligence]."[26]  The Court finds that Plaintiffs' injury arises from categories of acts which are not waived by the Immunity Act.  Therefore, Defendants are immune from suit as to Plaintiffs' cause of action for negligence.

#### 2.  Assault, Battery, and Wrongful Death

Defendants argue that they are entitled to summary judgment on Plaintiffs' assault, battery, and wrongful death causes of action because Officer Morrical's shooting of Thomson was in self defense, which is a complete defense to these claims.  Under Utah statute, a "person is

---

[24] *See, e.g.*, *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998).

[25] Utah Code Ann. § 63-30d-301(5) (2005).

[26] *Wright v. Univ. of Utah*, 876 P.2d 380, 383 (Utah Ct. App. 1994).

justified in using [deadly force] if he . . . reasonably believes that force is necessary to prevent death or serious bodily injury to himself or a third person as a result of the other's imminent use of unlawful force."[27]  As noted above, there are no issues of material fact as to whether Officer Morrical was acting in self defense.  Morrical reasonably believed that deadly force was necessary to prevent death or serious bodily injury to himself or other officers, as per Utah statute.  Therefore, the Court finds that Defendants are entitled to judgement as a matter of law on Plaintiffs' assault, battery, and wrongful death causes of action.

      3.  Intentional and Negligent Infliction of Emotional Distress

Defendants assert that they are entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claim because Morrical's actions were not extreme and outrageous when they were taken in self defense.  Because Morrical's actions taken in self defense cannot be extreme and outrageous, the Court finds that Defendants are entitled to judgment as a matter of law.

Defendants also assert that they are entitled to summary judgment on Plaintiffs' negligent infliction of emotional distress claim because Plaintiffs do not state a claim for negligent infliction, and because Defendants are entitled to immunity under the Immunity Act.  Defendants properly point out that negligent infliction of emotional distress requires that Plaintiffs show illness or bodily harm,[28] and that Plaintiffs have not pleaded or supported with any evidence this element of the cause of action.  Therefore, Defendants are entitled to judgment as a matter of law as to the negligent infliction of emotional distress claim.

---

[27] Utah Code Ann. § 76-2-402.

[28] *Anderson Dev. Co. v. Tobias*, 116 P.3d 339, 323 (Utah 2005).

## IV.   CONCLUSION

For the foregoing reasons, it is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 25) is GRANTED.  The clerk of the court shall enter judgment in favor of Defendants on all claims and close this case.

DATED   November 7, 2006.


BY THE COURT:

_____
TED STEWART
United States District Judge